DAWKINS, J.
This is a suit to annul a mineral lease upon .10 acres of land in the oil fields of Caddo parish, for the alleged failure to perform certain stipulations of said contract.
Defendant denied that the terms of the lease had been violated, and, in the alternative, prayed that, if it were annulled, defendant have judgment in reconvention for the sum of $4,003.51 paid to the conservation commission of Louisiana for work done in “killing” a certain wild gas well, as per the provisions of the contract.
There was judgment for plaintiff annulling the lease, and in favor of defendant in reconvention for $2,986, to be paid, from the proceeds of oil and gas sold from the said “wild well.”
Both sides have appealed.
Opinion.
The case was tried upon the following agreed statement of facts, to wit:
“It is admitted that the plaintiff is the owner of the land described, and that the corporation is organized under the laws of Louisiana.
“That the plaintiff executed a lease to S. R. Lippincott, a certified copy of which is to.be introduced in evidence.
“That at the time of this lease there was a wild gas well on the land in question, which Lippincott induced the conservation commission to attempt to kill. That the conservation commission did successfully kill said wild well, and charged the cost thereof to Lippincott or to his successors, and when the well was killed it was turned over to Lippincott or to his assigns, and that the present defendant, under its contract of purchase of the lease from Lippincott, has paid to the conservation commission the entire cost of killing said well, which amount was made up by popular subscription and paid to said conservation commission by the several oil and gas interests in the vicinity.
“It is admitted that on August 14, 1914, Lippincott transferred whatever rights he had, as will be shown by transfer to be offered in evidence, reserving to his wife an ‘undivided one-twentieth interest, and that the parties who thus acquired the lease, or whatever right Lippincott had in the lease, transferred it to the Texarkana Crude Oil Company, as will appear from a transfer, copy of which is to be filed in evidence, and that the Texarkana Crude Oil Company now claims to be the owner of this lease, and claims to have acquired all the rights and assumed all of the obligations provided therein under the act of transfer of August 4, 1914, as' recorded in Book 94, p. 785.
“It is admitted that the defendant never furnished the plaintiff with monthly statements of the oil or gas produced or sold from the premises, but that the plaintiff never made demand for such statements from the Texarkana Crude Oil Company, except through its attorneys.
“It is admitted that the defendant never delivered to the plaintiff any part of the oil or gas produced from .said premises, or any part of the proceeds derived from the sale thereof, claiming that this amount should be paid to the conservation commission for closing the well, and had paid to said conservation commission for its own account, and because of the popular subscription aforesaid the said expenditures incurred by said conservation commission in killing said well; the final payment having been made about date this suit was filed.
“It is admitted that no well was ever drilled for oil to ¡make a test at a depth of 2,500 feet,
“It is admitted that neither Lippincott nor the defendant drilled any preliminary well which may or may not be mentioned in the contract, and that neither the said conservation commission nor said Lippincott have yet received the sum of $25,000 from the revenues produced by said well.
“It is admitted that plaintiff has heretofore filed one suit to cancel said lease but voluntarily entered a nonsuit because defendant claimed a tax title to said (property) and said tax title was upset by judgment of this court, *311 and plaintiff was recognized as the owner of said land; whereupon the present suit was instituted again demanding a cancellation of the aforesaid lease.
“It is admitted that S. R. Lippincott is a nonresident of this state; that the Caddo Central Oil & Refining Corporation has and has had an agreement with the defendant, whereby it pays to it $400 per month for gas taken from the land, and which was being paid at the time the1 suit herein was filed, and that the Caddo Central Oil & Refining Corporation refused and refuses to pay plaintiff anything for such gas and continues to pay the defendant this amount.
“It is admitted that the receipts by the defendant .from the well in question for gas amounted to $15,150, and for oil $864.04 or a total of $16,014.04, a detailed statement of which is attached hereto.
“It is also admitted that Mrs. Gussie A. Lippincott, party hereto, is a nonresident of the state.
“All of the contracts between the plaintiff and S. R. Lippincott and his assignees, and with the conservation commission, are to be filed and considered as a part of the evidence in this case.”
At the time of entering into the contract assailed (July 1, 1913) plaintiff owned the 10 acres of land covered thereby, and upon which there was a flowing wild gas well-wild in the sense that it had gotten beyond control, and had to be killed or brought under control to make it of any value to the owner.
The “primary purpose” of the contract, as expressly stipulated therein, was “to control said wild well, or, if that cannot be done, to close it up in such manner as to stop the waste of gas.” As an incident to this object, it was further provided that, if it became “necessary or expedient to drill other wells, either for gas or oil, in the immediate proximity of said wild well, full authority to drill such additional wells” was granted. Work was to commence within 90 days and be completed within six months ; and, it being contemplated that additional wells might have to be drilled, was further stipulated that this delay should not commence to run “until after the completion of four preliminary wells,” and vthat all work was to be prosecuted in good faith subject only to unavoidable delays.
It was further provided that:
“As compensation for the work agreed to be done by said-lessee (killing or controlling said wild well), the said lessee shall receive the sum of twenty-five thousand ($25,000) dollars, and also one and one-half cents per thousand cubic feet for each thousand cubic feet of .gas delivered to said pipe line from said wild well during the period of one year from the connection of said wild well with said pipe line, provided further that said consideration shall become payable and be paid only on the conditions and in the manner following, viz.”
It was then provided that the lessee should pay all taxes upon the “premises” and “receive all the proceeds of the sale of gas from said wild well, and from the sale of oil or gas from any other wells which may (might) be sunk for the purpose of and in connection with the controlling or stopping of said wild well until the said sum of twenty-five thousand dollars ($25,000) has been fully paid, and also until said one and one-half cents per thousand cubic feet on each thousand feet of gas turned into said pipe line during the first year from said wild well as aforesaid * * * is paid”; and the one-eighth “income of the lessor” from all additional wells drilled “to relieve said wild well” was likewise pledged and assigned to the payment of the said $25,000, to continue until “the aforesaid consideration is paid. * * * ”
The lessee further bound himself to render to the lessor monthly statements of the gas and oil produced; and, if the wild well was controlled and continued as a producing well, when the “lessee shall have received his entire compensation as above stipulated” the same was to be turned over to the lessor.
It was further provided that,'if said wild well was successfully controlled or closed, the “lessor does hereby demise, let and lease *313 unto the lessee, his heirs and assigns, for the sole and only purpose of mining and operating for oil ahd gas * * * the premises above described,” to remain in force for ten years, or as long as oil and gas or either was produced in paying quantities. After payment of the consideration above mentioned for controlling the wild well, the lessor was to receive one-eighth of the oil and gas, or one-eighth of their proceeds.
An interpretation of the following clause in the contract presents one of the serious issues in the ease, and we therefore quote the same at length, to wit:
“After the work of controlling or killing said wild well has been paid for, as hereinbefore stipulated, the leases for the general and further development of said premises shall terminate and be forfeited by the lessee unless he shall within one year after the completion of drilling all the necessary preliminary wells for the controlling or killing of the 'said wild well, and after said wild well has been duly controlled and killed, shall drill one deep test for oil to a depth of two thousand five hundred feet, that said test shall test out both the shallow and deep strata for oil, and if either stratas (stratse) shall produce oil in paying quantities, then said lessee shall complete two producing paying wells on said premises within one year from the completion of the aforesaid work on the wild well, and that further, as two producing oil wells is considered sufficient for ten acres, especially in view of the fact that said wild well has destroyed and torn up considerable of the surface of the said ten acres, that two producing paying oil wells on said tract shall continue this lease in full force and effect as long as oil or gas is produced in paying quantities thereon. * * * ”
There are two questions to be determined in this case, viz.:
First. Did Lippincott (defendant having succeeded to his rights) earn the stipulated consideration for closing the wild well, and, if so, how much remains due?
Second. Was the contract violated in any of its essential features, so as to forfeit the lease?
1. As to the first point, it is admitted in the agreed statement of facts that Lippincott induced the conservation commission to take charge of and control the wild well, which was done with complete success, and that the same was paid for by popular subscription ; and it became unnecessary to bore any additional wells for that purpose. In these circumstanced we do not think it concerns the plaintiff as to how he brought about this result; it was a performance by Lippincott of the primary obligation of his contract, done at his instance; and we know-of no law or equitable reason (none having been cited by plaintiff) which would deprive him or his assigns of the fruits of his efforts.
o We think the compensation of $25,000 and iy2 cents per thousand cubic feet on all gas that was sold from the wild well during the first year following connection with the pipe line was earned, and should be paid in accordance with the terms of the contract.
2. As to the forfeiture of the lease, while at first appearance the wording of the paragraph quoted last above seems a little ambiguous, we think that by a fair construction the lessee was bound to commence drilling wells for general development of the property, as distinguished from those which might become necessary to control the wild well, within one year from “the controlling or killing of the said wild well. * * * ” Of course, if defendant were right in its contention that it was under no obligation to bore such general development wells until the contract price for controlling the wild well had been paid, then the lease had not been lost when this suit was filed; for, admittedly, only $16,014.04 had been realized from that well. However, the contract reads:
“After the work of controlling or killing said wild well has been paid for, as hereinabove stipulated, the lessee (lease) for the general and further development of said,' premises shall terminate and be forfeited by the lessee *315 unless he shall within one year [not from the payment for the work, but] after the completion of drilling all the necessary preliminary wells for the controlling or killing of the said wild well, and after said wild well has been duly controlled and killed, shall drill one deep test well for oil * * * and the said lessee shall complete two producing oil wells on said premises within one year from the completion of the aforesaid work on the wild well. :{: * * J»
It was not and could not have been known, at the time the contract was made, how long it would take for the proceeds arising from the wild well and the additional preliminary wells which it was thought would be necessary to drill, to pay the contract price above mentioned (as a matter of fact, as above disclosed, it had not been paid during the period of approximately eight years which had elapsed from the date of the contract and the filing of this suit); but the time was certain and comparatively short within which the lessee might complete the work of controlling or killing the wild well, i. e., not more than six months .after the boring of a maximum of four preliminary wells for that purpose.
In view of the repetition of the requirement that the work of general development should begin “within one year * * * after said wild well has been duly controlled or killed,” and the completion of “two producing oil wells on said premises within one year from the completion of the aforesaid work on the wild well,” which was declared would be full development in view of the limited area, considering that these provisions deal specifically with the question of forfeiture, and make time of the essence of their performance, appearing as the later expressions of the intention of the parties, we think they are controlling, and that the failure to bore the additional wells for general development within the year from the controlling of the wild well caused the forfeiture of the lease. Otherwise, at the rate at which the consideration was being paid (approximately $16,000 in 8 years), it would have required 5 or 6 years longer to pay the price of controlling the wild well, or a total* of. 13 or 14 years. In the meantime the plaintiff would have to sit by, with his property undeveloped, in a proven and largely producing oil field, and have it drained of oil and gas by his neighbors, merely because the lessee had not seen fit to drill any more wells until it had been paid for the aforesaid work out of the wild well. We do not believe the contract warrants a construction producing such harsh results, and which might easily have been foreseen had the parties intended it. What the plaintiff; wanted, and what the contract contemplated, primarily, was the controlling or killing of the wild well, and, secondly, the reasonable development of the property for oil and gas. The latter plaintiff did not get, and it is now too late for defendant to assert that right. Prince v. Standard Oil Co., 147 La. 283, 84 South. 657; Green v. Standard Oil Co., 146 La. 935, 84 South. 211.
As indicated heretofore in this opinion, we think the entire consideration for controlling the wild well, to wit, $25,000, and 1% cents per thousand cubic feet additional for gas for the period of one year after connecting the wild well with the pipe line, was earned and became due to Lippincott and his assigns. Hence the defendant should receive from the well which was controlled (there being an express waiver in the contract of any personal liability on the part of plaintiff) such sum as will cover the stipulated price.' There is nothing in the record to show how much gas was sold during the first year of connection with the pipe line, and the case will have to be remanded for the determination of that fact. However, the lease should be annulled, and, upon an accounting and ascertainment of the exact amount due defendant on the basis suggested, defendant should continue to receive the revenues from the wild well until the said amount is fully paid; but, if, *317 upon such accounting, the plaintiff should see fit, he should be permitted to pay the said balance and free the property from any further claims of defendant.
For the reasons assigned, the judgment appealed from is affirmed in so far as it annuls the lease, but is set aside in all other respects, and this case is remanded to the lower court to ascertain the quantity of gas produced during the first year after connection of the well with the pipe line and sold therefrom ; and it is further ordered and decreed that, when this is done, the value thereof at 1% cents per thousand cubic feet be added to the sum of $25,000 and that all sums received by defendant and its transferors from the proceeds or production of said wild well, or that may be due thereon, be credited against the amount so agreed to be paid Lippincott or his assigns, and that, in payment of the balance, defendant shall continue to receive the proceeds from said wild well until the same is fully satisfied; provided that, if plaintiff shall so elect, he may pay to defendant said balance in cash, and free his said property from all other claims on account of the said contract of January 6, 1913. The costs of this appeal are to be borne equally by plaintiff and defendant, and those of the lower court are to be paid by defendant.